LEROY FITCH AND IRENE FITCH, HIS WIFE, APPEL-
LANTS, *v.* GENE LATOURRETTE, THOMAS
McKEOWN, WASHOE TITLE INSURANCE
COMPANY, A NEVADA CORPORATION, FIRST
NATIONAL BANK OF NEVADA, A NATIONAL
BANKING CORPORATION, SAMUEL F. BEARDSLEY
AND FLORENCE W. BEARDSLEY, HIS WIFE,
AND WILLIAM H. SCHAEFER AND GRACE M.
SCHAEFER, HIS WIFE, RESPONDENTS.

No. 4197

November 25, 1959                 346 P.2d 704

*Ernest S. Brown,* of Reno, for Appellants.

*Emile J. Gezelin,* of Reno, for Respondents Gene
LaTourrette and Thomas McKeown.

*Sidney W. Robinson,* of Reno, for remaining Respond-
ents.

## O P I N I O N

By the Court, BADT, J.:

The parties to the appeal will be referred to by abbreviated names.

Fitch owned six lots in Reno. He sold them through his real estate agents and brokers, LaTourrette and McKeown, to LaRoque for $13,500 under a written agreement that such sum was payable on or before 18 months. Deed was executed and recorded. Nothing was paid down, but LaRoque executed and recorded a deed of trust to secure the entire purchase price. The contract of sale contained, among others, the following provisions:

"1. Buyers contemplate the construction of a dwelling house upon each of the said lots, the cost thereof to be financed by loans from Union Federal Savings and Loan Association at Reno, Nevada, or some other lending agency and to give as security for the payment of each such loan a deed of trust upon the particular lot upon which such improvements are placed and which said deed of trust shall be superior to the deed of trust of the Sellers to the extent of monies advanced for such construction costs.

"2. Upon the sale of each of the said dwelling house units the Sellers shall be entitled to receive the sum of two thousand two hundred fifty dollars ($2,250.00) and upon such payment shall release the lot so sold from the lien of the trust deed securing payment of the sums due them hereunder.

"4. Sellers agree to pay a real estate commission of one thousand, three hundred fifty dollars ($1,350.00) to LaTourrette & McKeown in connection with this transaction."

The brokers mentioned in paragraph 4 above quoted were not parties to the contract of sale and there was, at the time, no independent written or oral contract as to when the brokers' commissions were payable.

Three lots were sold, each as a separate transaction, and in each case a construction loan was financed through the First National Bank. In each case the bank's

commitment was dependent upon its receiving a deed of trust as a first lien on the property. In each case escrow papers were put through the title company. In each case Fitch executed an authorization to the title company to execute a reconveyance of the particular lot involved. In each instance of these three sales Fitch had to wait, not only for the whole construction period, but until the expiration of the period for filing labor and material liens against the property, to the end that he was paid his purchase price of the lot (less the commission, which went directly to LaTourrette and McKeown) out of the final moneys that were made available by the bank. On each occasion no advance to any extent whatsoever was made by the bank until the recording of the partial reconveyance by the trustee under Fitch's written instructions and the execution of a title certificate by the title company to the effect that the bank's deed of trust was a first lien.

On the occasion of Fitch's execution of the first authorization for the title company to reconvey he was told by McKeown that he was fully protected by his deed of trust, but that he ought to be advised by his own attorney. He phoned an attorney, telling him that he wanted his advice to like extent as if he were protecting his own property. The attorney told him that he could safely sign the papers. Fitch kept reiterating that McKeown assured him that he, Fitch, was protected by his deed of trust. On this first sale McKeown admitted that he so advised Fitch, but explained at the trial that this was because he felt that Fitch was amply protected by the lien of his deed of trust on the remaining five lots. McKeown insisted, however, that he had not made such statements on the occasion of any of the later sales.

As noted, there were ample funds to pay Fitch on the first three sales and construction contracts and likewise to pay out of such money the commissions to the brokers.

The situation arising out of the last two sales—the sales to Beardsley and to Schaefer, gave rise to the present litigation. Fitch and his wife signed the authorizations for reconveyance. These papers authorized the

title company to record the reconveyance at once. Fitch testified that his understanding was that the papers would not be recorded until his sale price of $2,250 was either on deposit with the title company for him or the payment definitely assured. McKeown denies this. He testified that he told Fitch that these last sales would go through the regular normal procedures, the same as the former sales. Fitch testified that it was agreeable to him that payment to him would be delayed until the expiration of time for filing liens, but that it was not agreeable to him to waive his first lien without assurance of payment. So far, then, as this appeal attacks the judgment absolving LaTourrette and McKeown of fraud, it is apparent that the trial court accepted the testimony of McKeown, supported, as it was, by the circumstances attending the first three sales. With such finding this court will not interfere.

When it appeared that LaRoque became insolvent and that the surety company that wrote his performance bond had taken over the completion of his contract, the bank, which had theretofore sent its final payment of some $3,500 under the Schaefer contract to the title company, demanded and received from the title company the return of such payment so that the same might be paid to the bonding company or to persons having material or labor liens. Total advances by the bank under said contract amounted to some $17,000 and it would appear from the bank's memorandum of advances on each of the two contracts in question that all such advances were made after the reconveyances by the title company to LaRoque under the written authorizations signed by Fitch and his wife. In both the Beardsley sale and the Schaefer sale LaRoque had executed an assignment authorizing the bank to pay to Fitch the moneys due the latter under each of the two respective deals.

Fitch, receiving no moneys in either the Beardsley or Schaefer deals, commenced this action, joining as defendants LaRoque, the title company, the bank, LaTourrette and McKeown, Beardsley and Schaefer. LaRoque defaulted. He was insolvent. He is not a party

to this appeal. We have already disposed of Fitch's appeal from the judgment absolving LaTourrette and McKeown from the charges of fraud. Fitch's cause of action against the title company and the bank was based upon the original escrow and their knowledge of its terms whereunder his sale price was protected by a first lien and whereunder the property was not to be reconveyed until payment of such price. He alleged the complete knowledge of the title company and the bank of this situation. While it is true that the original Fitch-LaRoque contract provided that Fitch's trust deed was not to be released as against the respective lots until the $2,250 purchase price of each lot was actually paid Fitch, the same contract bound Fitch to the knowledge that LaRoque contemplated construction of a dwelling on each lot, financed by the bank's advances, to be secured by a deed of trust "superior to the deed of trust of [Fitch] to the extent of moneys advanced for such construction costs."

The situation of course resulted in an impasse. The title company's reconveyance under Fitch's written instructions of course would destroy, and did destroy, his first lien. But without this the bank would make no advances on its construction loan, a situation well known to all parties. A refusal by Fitch to authorize the partial reconveyance would have meant no loan, no construction of the residence, no sale of the lot. Perhaps Fitch was ill advised. Perhaps an agreement subordinating his lien to that of the bank would have sufficed, thus leaving Fitch at least with a second lien. Or perhaps he could have obtained a second mortgage or deed of trust. Instead, he caused the reconveyance to be executed and recorded and accepted in its place an assignment from LaRoque to himself of balance of moneys due LaRoque under the building contract. This was quite effective on the first three lots upon which buildings were constructed, in which cases Fitch suffered only the delay in awaiting the completion of construction and the final payment by the bank. The same course, resulting in each

case of a modification of the original plan, proved disastrous to Fitch when LaRoque became insolvent, the surety on the contract bond took over, and there was no surplus of funds upon which LaRoque's assignment to Fitch could become operative.

This situation is reflected in the trial court's findings that Fitch elected to look to the personal credit of LaRoque and agreed to accept the purchase price of each lot out of LaRoque's assignment to him out of moneys payable to LaRoque under his building contract. These findings are amply supported. The court gave Fitch the only relief available, an apparently worthless judgment against LaRoque for $4,500, the purchase price of the two lots. In these findings and the judgment based thereon, we find no error.

The lower court's denial of relief against Beardsley and Schaefer was likewise without error. Beardsley and Schaefer bought from LaRoque under independent agreements. Payment was conditioned on issuance of title insurance showing title respectively in Beardsley and Schaefer, but subject to the bank's trust deed. No cause of action was established on the part of Fitch against either Schaefer or Beardsley.

Another issue remains to be considered. The court awarded LaTourrette and McKeown judgment for commissions. Fitch appeals from this judgment also. McKeown testified positively that in his agreement with Fitch for the sale by his firm of Fitch's lots, the firm would await payment of its commissions "until [Fitch] had received the sum designated as a purchase price of each respective lot." The brokers insist that payment of their commissions became due upon the original sale from Fitch to LaRoque and rely upon the decision of this court in Engel v. Wilcox, 75 Nev. 323, 340 P.2d 93, in which we held that the defaults of the buyers did not destroy the obligation of the seller to pay the brokers' commissions. However, in that case we clearly distinguished the cases in which it appeared that commissions to the brokers were payable out of the purchase

money, which is the case here. The original Fitch-LaRoque agreement of sale of the six lots negotiated by LaTourrette and McKeown recognized the contemplation of the parties that the bank would have to finance the construction of a dwelling on each lot, and provided for the payment of commission to LaTourrette and McKeown "in connection with this transaction." No time was fixed for such payment. The brokers realized from the beginning the nature of the LaRoque sale as being merely preliminary to future sales and construction contracts by LaRoque through FHA financing, emphasized by the fact that no down payment was required on the preliminary sale. They apparently did not expect and never demanded payment of commissions on the sales of the first three lots until the money became available to Fitch out of the respective final bank payments.

The judgment denying relief to appellants as against all respondents is affirmed with costs.

The judgment in favor of LaTourrette and McKeown in the sum of $675 is reversed with costs, and remanded with instructions to enter judgment in favor of appellants on the said counterclaim of LaTourrette and McKeown. Any difficulties attendant upon apportioning the respective costs awarded growing out of the determination of what parts of the transcript are devoted to the respective issues do not require present determination. We may note, however, the inclusion in the record of sundry briefs filed in the district court. Such briefs serve only to encumber the records of this court, have no place in the record on appeal, and must be disregarded with reference to the apportionment of costs.

McNAMEE, C. J., and PIKE, J., concur.